# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| IN RE ) | |
| ) | Case No. 09-00970-TLM |
| DAVID LEE CARLSON and ) | |
| KATHERINE CARLSON, ) | |
| ) | Chapter 7 |
| Debtors. ) | |
| _____ ) | |
| ) | |
| JEFFREY G. FETTY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. No. 09-6055-TLM |
| ) | |
| DL CARLSON ENTERPRISES, ) | |
| INC., dba Cottman Transmission, ) | |
| an Idaho corporation, DAVID LEE ) | |
| CARLSON and KATHERINE ) | |
| CARLSON, ) | |
| Defendants. ) | |
| _____ ) | |

## MEMORANDUM OF DECISION[1]

_____

## INTRODUCTION AND PROCEDURAL BACKGROUND

David Carlson ("Carlson") and Katherine Carlson (collectively "Debtors")

filed a voluntary joint petition for chapter 7 relief on April 17, 2009.  On July 20,

_____

[1]  This Decision constitutes the Court's findings of fact and conclusions of law.  *See* Fed.
R. Bankr. P. 7052 (incorporating Fed. R. Civ. P. 52).

MEMORANDUM OF DECISION - 1

2009, Jeffrey Fetty ("Plaintiff") timely filed a complaint commencing this adversary proceeding against Debtors seeking to establish the nondischargeability of a debt under § 523.[2]  Adv. Doc. No. 1.  The complaint also named as a defendant DL Carlson Enterprises, Inc., dba Cottman Transmission ("Cottman").[3]

Plaintiff's complaint asserts several causes of action.  Plaintiff claims Cottman committed fraud in its dealings with Plaintiff, and that a fraud claim against a dissolved corporation can be asserted against the corporation's shareholders.  *Id.* at 10-11.  That claim or cause further alleges the amount of fraud damages proven would be nondischargeable under § 523(a)(2)(A) or § 523(a)(4).  *Id.* at 11.

Plaintiff also contends Cottman violated the Idaho Consumer Protection Act, Idaho Code § 48-601 *et seq.* ("ICPA"), and is liable for damages thereunder, which damages may similarly be enforced against the corporation's shareholders and which debt would be nondischargeable as to Debtors under § 523(a)(6).  *Id.* at 11-12.

Plaintiff also alleges he can "pierce the corporate veil" and obtain a judgment of nondischargeability under § 523(a)(2), (4) and (6).  *Id.* at 12-13.

---

[2]  Unless otherwise indicated, statutory citations are to the Bankruptcy Code, Title 11 U.S. Code §§ 101-1532, and Rule citations are to the Federal Rules of Bankruptcy Procedure.

[3]  "DL Carlson Enterprises, Inc., dba Cottman Transmission" never answered the complaint, or otherwise appeared, and was not represented at trial.

MEMORANDUM OF DECISION - 2

Finally, Plaintiff requests costs and attorneys' fees. *Id.* at 13-14.[4]

Plaintiff's pretrial brief focused exclusively on § 523(a)(2)(A), and on Debtors' liability for Cottman's fraud under a theory of piercing the corporate veil. Adv. Doc. No. 23.

**FACTS[5]**

Plaintiff, as the owner of a commercial flooring company, used his 2005 Chevrolet Silverado 2500 HD (heavy duty), four-door, long-box pick-up truck (the "Vehicle") to haul extremely heavy loads. In order to transport such heavy loads, Plaintiff customized his Vehicle. He installed a heavy duty suspension, new exhaust, springs, shocks and tires. In addition, Plaintiff purchased a Sun Coast triple disk torque converter directly from Sun Coast and brought it to Cottman to install in March, 2006. *See* Ex. 102. Plaintiff brought the converter to Cottman in its original packaging which clearly warns that the bolts supplied with the converter must be used in installation. *See* Ex. 101.

In October, 2006, Plaintiff noticed vibrations and knocking noises coming

---

[4] Plaintiff also claimed Debtors liquidated the assets of Cottman and distributed the proceeds to themselves, and that this constituted a fraudulent transfer under Idaho Code § 55-901 *et seq.* Adv. Doc. No. 1 at 8-9. However, in a pretrial brief, Plaintiff expressly abandoned this cause of action. Adv. Doc. No. 23 at 8.

[5] The facts are gleaned from the Court's review of the testimony presented and exhibits admitted into evidence at trial. Most of what follows is based on live testimony, particularly that of Plaintiff and Debtors. One witness' testimony, that of Cottman's manager, Eric Davis, was presented through deposition. *See* Ex. 207. The Court will note later where Davis' testimony varied from that of the other witnesses.

MEMORANDUM OF DECISION - 3

from the Vehicle.  Plaintiff first took his Vehicle back to the truck dealership.  The

dealership's mechanic determined there was nothing wrong with the engine and

suggested the problem was with the transmission.  Plaintiff then returned to

Cottman.  Upon examining the transmission and Sun Coast converter, a Cottman

technician discovered loose bolts and recommended tightening the bolts with

"Loctite," a type of thread-locking adhesive.  *See* Ex. 103.  Plaintiff was not in

favor of this solution and was concerned about possible damage to the flex plate.

Plaintiff testified that Carlson assured him there was no damage and guaranteed

that if he allowed Cottman to tighten the bolts with Loctite, they would not come

loose again.  Moreover, Plaintiff says Carlson told him that if the bolts did come

loose again, Cottman would fix any damage caused.  Given that the original 12

month/12,000 mile warranty was close to expiring, Plaintiff accepted the

representation that should something go wrong with the bolts, Cottman would fix

the problem, and he allowed Cottman to re-tighten and apply Loctite to the bolts.[6]

Nine months later, in July, 2007, Plaintiff took the Vehicle on a trip to

Michigan and again encountered problems.  Plaintiff called Cottman and advised

its manager, Eric Davis, that he was again experiencing vibrations in the Vehicle.

Davis told Plaintiff to take the vehicle to another Cottman Transmission facility, or

---

[6] Carlson did not recall this conversation with Plaintiff regarding bolts.  Instead, Carlson
testified that he would have honored the warranty, but he did not recall making a promise that
would extend the warranty.

MEMORANDUM OF DECISION - 4

to an AAMCO Transmission facility, which was an affiliated franchise.  Plaintiff

did take the Vehicle to an AAMCO, but after discovering that AAMCO had no

certified Allison technician, he took the Vehicle to another business, J.B. Dlco.

Davis authorized Plaintiff to take the Vehicle to J.B. Dlco and agreed to reimburse

the costs of repair.  But he asked that J.B. Dlco only tighten any loose bolts so that

Plaintiff could get the Vehicle back to Boise and Cottman could then repair the

problem.

Upon J.B. Dlco removing the bolts, they discovered one bolt had broken off

completely.  *See* Ex. 109.  When viewing the bolts, Plaintiff discovered for the first

time that the bolts used to install the Sun Coast converter were stock bolts, which

were longer than the bolts provided by Sun Coast.  Plaintiff allowed J.B. Dlco to

reinstall 5 more "stock" torque converter bolts and ordered several more to use as

comparisons to the Sun Coast bolts.  *Id.*  Plaintiff then ordered a transmission oil

cooler from Sun Coast and a new set of Sun Coast bolts for comparison purposes.

*See* Ex. 110.

Upon returning to Boise in September, 2007, Plaintiff took his Vehicle back

to Cottman.  He requested that Cottman contact him when the Sun Coast converter

was removed from his Vehicle so he could view the damage.  Cottman did not

contact Plaintiff as requested; instead, it was only upon Plaintiff's further inquiry

that he discovered the Sun Coast converter had been removed from the Vehicle.

MEMORANDUM OF DECISION - 5

Plaintiff inspected the converter and saw that the bolt holes were elongated or "egged out" and the bolts wiggled back and forth. Because Plaintiff was concerned over possible dimpling to the flex plate, he requested that Cottman replace the plate and repair the Sun Coast converter. Since that repair could take two weeks and Plaintiff needed his Vehicle, Davis instead suggested installing a different type of torque converter.

Plaintiff and Davis discussed alternate converters in the Cottman office. At that time, Davis and Plaintiff visited the ATS "diesel performance" Internet website. Davis then, in Plaintiff's presence, got on the phone with ATS and requested the price on their "biggest, baddest" triple disc converter. When he got off the phone, Davis offered Plaintiff an ATS triple disc converter. The parties agreed that an ATS TripleLok torque converter would be ordered and installed.[7]

Plaintiff left the Vehicle with Cottman so that the ATS converter could be installed. Several days later, Cottman notified Plaintiff that his Vehicle was ready to be picked up. Plaintiff could not retrieve his Vehicle until the following day when Cottman was closed. Because he picked up the Vehicle after hours, he did not receive an invoice or repair order for the work performed.

When he got home, Plaintiff immediately crawled under the Vehicle and

---

[7] Originally, Plaintiff researched several converters and narrowed his choice of converters to two – the Sun Coast and the ATS. While he ultimately purchased the less costly Sun Coast in 2006, he was happy to now receive an ATS converter, and testified that was the only alternate torque converter he would have accepted.

MEMORANDUM OF DECISION - 6

removed a small inspection cover over the transmission to view the new converter.

Plaintiff immediately noticed that the converter installed in his Vehicle was blue,

and he understood all ATS converters were "Viking purple" in color. Plaintiff

called ATS to ask if they made a blue converter and was informed that, if the

converter was not Viking purple, it was not an ATS converter.

Plaintiff requested a repair order from Cottman to see what Cottman had

installed in his truck. He did not advise Cottman that he did not believe an ATS

converter had been installed. It took several weeks to receive the repair order, a

delay Davis attributed to a software issue. Plaintiff eventually received a repair

order listing an "ATS billet TripleLok" as the converter installed in his Vehicle.

*See* Ex. 104.

After receiving the repair order, Plaintiff confronted Davis with his

suspicion that an ATS converter was not installed in the Vehicle as represented.

Davis was adamant that an ATS converter was installed. Upon Davis' insistence

that an ATS converter was installed, Plaintiff requested a copy of Cottman's

purchase invoice for the ATS converter. Davis told Plaintiff it could take several

weeks to get it, citing more paperwork problems. Plaintiff never received the

invoice. Plaintiff later discovered that Cottman never purchased an ATS converter

but, instead, purchased and installed a Precision single disk converter in Plaintiff's

Vehicle.

MEMORANDUM OF DECISION - 7

Thereafter, Plaintiff took the issue up with Carlson. After speaking with Carlson, he believed Cottman would take care of retrieving, fixing and reinstalling his Sun Coast converter.[8] It took several weeks to retrieve the Sun Coast converter which had been shipped out by Cottman as a core. Once Cottman retrieved the Sun Coast converter, Plaintiff went to pick it up. Plaintiff was under the impression that he would personally send the converter in to Sun Coast for repair and be reimbursed by Cottman. When Plaintiff inquired as to how exactly he would get reimbursed, Davis told him that Cottman was "done" with the whole transaction. That conversation was the end of Plaintiff's dealings with Cottman, Davis or Carlson, at least until approximately three months later when Plaintiff initiated his state court lawsuit against Cottman on January 29, 2008.

In October, 2009, two years after the ATS converter was promised but not installed, Plaintiff shipped his Sun Coast converter back to Sun Coast to have it repaired. Ex. 111. Sun Coast repaired the converter, and Plaintiff paid $533.50 for the repair in addition to a $70.00 shipping charge.

On December 7, 2009, with over 33,000 miles on the Cottman-installed Precision converter, Plaintiff removed that converter from his Vehicle and had his Sun Coast converter reinstalled by a different company. *See* Ex. 118.

As earlier noted, the foregoing facts are based primarily on Plaintiff's

---

[8] Carlson did not recall a conversation with Plaintiff regarding such repairs.

MEMORANDUM OF DECISION - 8

testimony.  A contrary version of certain events appears in Davis' deposition.

Davis testified as follows:

– Davis and Plaintiff personally inspected the bolts prior to Plaintiff's

Michigan trip.  Davis explained to Plaintiff that the original bolts that came with

the Sun Coast converter were too short, and he showed Plaintiff that there was

sufficient room for use of longer bolts.  Plaintiff's "common sense kicked in"

following this inspection, and he authorized the longer bolts to be installed.  Ex.

207 at 9-10.

– Davis was never told that Plaintiff was taking the truck to J.B. Dlco in

Michigan, and Davis did not authorize him to do so.  *Id.* at 12-13.

– After the Michigan trip, when the truck came back in to Cottman, Davis

determined the converter needed to be replaced due to a broken bolt and also

because there was too much damage from the egging of the bolt holes.  While

Davis indicated Plaintiff initially wanted another Sun Coast converter, Davis was

not impressed with their quality and recommended installing a Precision converter

instead.  According to Davis, Plaintiff said "Well, it sounds like you [*i.e.*, Davis]

know what you're talking about.  How about we just leave it in your hands and

you use the converter that you want to use."  Davis then ordered and installed a

Precision heavy duty converter.  *Id.* at 15-18.  Plaintiff agreed to installation of the

Precision single disk billet converter.  *Id*. at 41.  The replacement with the

MEMORANDUM OF DECISION - 9

Precision converter was done free of charge to Plaintiff even though the prior

converter was out of warranty. *Id.* at 23.[9]

   – The reason that the related repair invoice showed an "ats billet triplelok"

was because Plaintiff "demanded" it. *Id.* at 42. Davis indicated Plaintiff wanted

such a receipt so he could represent, when later selling the truck, that it had an

ATS converter. *Id.* at 21, 41-42. Davis further indicated that he acquiesced in

providing the inaccurate receipt in large part because Plaintiff was "loud and

arrogant," "irate," "rude," and making a scene in front of other Cottman customers,

and Davis wanted him to leave. *Id.* at 20-22.

**TRIAL**

   When trial commenced on December 17, 2009, the parties stipulated to the

admission of all Plaintiff's exhibits, Exs. 100-117, and all of Debtors' exhibits,

Exs. 201-208. The latter included the deposition testimony of Davis, Ex. 207.

Plaintiff, his wife, and Don Rainey testified. Plaintiff then rested his case.

   At the close of Plaintiff's case on December 17, 2009, Debtors moved for a

judgment based on partial findings under Fed. R. Bankr. P. 7052. The Court took

that motion under advisement following argument, and adjourned the trial pending

a ruling on the motion.

   Plaintiff subsequently filed a motion to reopen its case in chief in order to

---

   [9]  Plaintiff agrees the 2007 converter installation was done free of charge.

MEMORANDUM OF DECISION - 10

present additional evidence.  Doc. No. 29.  Debtors objected to that motion,

however, the Court granted Plaintiff's motion to reopen and on February 5, 2010,

trial resumed.  At that time, the parties stipulated to the admission of Exs. 118 and

209, and Plaintiff called Carlson to the stand.  Upon the conclusion of Carlson's

testimony, Plaintiff rested his case.  Debtors did not renew their motion for

judgment based on partial findings.  Instead, Debtors called Ms. Carlson to the

stand and then rested their case.  The Court took the matter under advisement.

**DISCUSSION AND DISPOSITION**

In closing argument, Plaintiff abandoned his § 523(a)(4) and § 523(a)(6)

causes.[10]  Ultimately, Plaintiff attempted to establish a cause of action against

Debtors for nondischargeability of debt sounding under § 523(a)(2)(A).  Plaintiff

did not claim fraud based on any representation made personally by either of the

Debtors.  Instead, Plaintiff based his claim on Davis' promise, on behalf of

Cottman, to replace Plaintiff's damaged Sun Coast converter with an ATS

converter.

Recognizing that Debtors made no fraudulent representations personally,

Plaintiff's theory of the case is premised on the idea that Cottman (*i.e.*, DL Carlson

Enterprises, Inc.) was Debtors' alter ego and the Court should pierce the corporate

---

[10]  Plaintiff continued to advance his arguments regarding violations of the ICPA in
relation to the § 523(a)(2)(A) cause of action even though, in his complaint, the allegations
regarding ICPA violations were associated solely with the abandoned § 523(a)(6) cause of action.

MEMORANDUM OF DECISION - 11

veil, making Debtors liable for Cottman's debts.  *See*, *e.g.*, Adv. Doc. No. 1 at 12-13 ("Count Four (Pierce the Corporate Veil)").  Plaintiff stated in his pretrial brief, Adv. Doc. No. 23:

> These misrepresentations and material omissions were employed by Cottman to the financial detriment of Fetty.  Accordingly, Fetty filed this action seeking relief in the form of an order from the Court finding: (1) that the actions of Cottman constitute actual fraud and/or violation of the Idaho Consumer Protection Act, and (2) David and Katherine Carlson ("Carlsons"), Debtors and owners of Cottman, are liable for the fraudulent actions of Cottman under the "pierce the corporate veil" theory and, as such, Cottman's liability flow [sic] to them and is nondischargeable under 11 U.S.C. § 523, Bankruptcy Code."

*Id.* at 3.

### A.    Piercing the corporate veil

Plaintiff established Debtors owned the corporation that did business as Cottman.  Carlson testified that he was the president and 51% owner of DL Carlson Enterprises, Inc., the Idaho corporation doing business as Cottman.  *See* Ex. 209.  He further testified that Ms. Carlson was the vice president and 49% owner of the corporation.  *Id.*

The Court must next determine if the corporate veil should be pierced, making the owners of the corporation liable for its debts.

> Piercing the corporate veil is "[t]he judicial act of imposing personal liability on otherwise immune corporate officers, directors, and shareholders for the corporation's wrongful acts."  Black Law Dictionary 1184 (8th ed. 2004).  The theory allows the fact finder to disregard the corporate form, thereby making individuals liable for corporate debts or making corporate assets reachable to satisfy

MEMORANDUM OF DECISION - 12

obligations of the individual. *Minich v. Gem State Developers, Inc.*, 99
Idaho 911, 917, 591 P.2d 1078, 1084 (1979).

*VFP VC v. Dakota Co.*, 109 P.3d 714, 723 (Idaho 2005). Under Idaho law, two

requirements must be met to disregard the form of the corporate entity and impose

personal liability on the shareholder. First, Plaintiff must prove a unity of interest

and ownership such that separate legal personalities of the corporation and

individual no longer exist. Second, Plaintiff must show that, if the acts are treated

as those of the corporation, an inequitable result would follow or that it would

sanction a fraud or promote injustice. *Id.*; *see also Maroun v. Wyreless Sys., Inc.*,

114 P.3d 974, 983 (Idaho 2005) (quoting *Hayhurst v. Boyd*, 300 P. 895, 897 (Idaho

1931)). Such a determination should be made "cautiously and only where

circumstances justify it." *Jolley v. Idaho Sec., Inc.*, 414 P.2d 879, 887 (Idaho

1966).[11]

Idaho courts have identified several factors that a court should consider

when determining if the corporation and individual owners have maintained

separate personalities. *See Alpine Packing Co. v. H. H. Keim Co.*, 828 P.2d 325,

327 (Idaho Ct. App. 1991). Courts have pierced the corporate veil when presented

with facts such as "(1) the sole shareholder acted as president of the corporation;

(2) a lack of corporate formalities, such as directors' meetings; (3) the shareholder's

---

[11]  The issue is not foreign to this Court. *See Sterling Int'l, Inc. v. Thomas (In re Thomas)*, 03.3 I.B.C.R. 178, 182 (Bankr. D. Idaho 2003) (concluding upon preponderance of conflicting evidence that veil would be pierced).

MEMORANDUM OF DECISION - 13

failure to submit corporate contracts and inventory revisions to the board of

directors; and (4) transfer of funds, accrual and payment of accounts, and

satisfaction of intercompany claims without approval by any director or officer of

the corporation." *Id.*

Here, Carlson testified that Debtors created DL Carlson Enterprises, Inc. in

order to enter into the Cottman franchise agreement.  Debtors were the sole

shareholders.  While Debtors purported to assign stock in DL Carlson Enterprises,

Inc., *i.e.,* 51,000 shares to Carlson and 49,000 shares to Ms. Carlson, no stock

certificates were ever issued.[12]  *See* Ex. 209.  In addition, while initially there was

a third officer of the corporation, Vernon Martell, Ms. Carlson testified that

Debtors were the only officers of the corporation after the first year.

Regularly scheduled, annual corporate shareholder meetings were not held

as required by Idaho Code § 30-1-701.  An initial meeting was held on June 1,

2005.  *See* Ex. 209.  While Carlson testified that Debtors had numerous meetings,

the evidence establishes that with the exception of the June 1, 2005 meeting of

shareholders, those meetings were not shareholder meetings but were instead

business meetings to discuss business strategy.  No voting or elections occurred

---

[12]  While shares in a corporation may be issued without stock certificates, Idaho Code
§ 30-1-626(2) requires an alternate notice from a corporation that takes such an approach.
Carlson could not remember receiving stock certificates and no written statement containing the
required information was discussed or introduced into evidence.

MEMORANDUM OF DECISION - 14

during those meetings and no minutes were kept.[13]

Debtors entered into a number of contracts in their personal capacity for the corporation's benefit. *See e.g.*, Ex. 114 (January, 2005 commercial real property lease between First Class Holdings, Ltd. and Carlson "doing business as Cottman Transmissions" for the premises where DL Carlson Enterprises, Inc. operated the Cottman franchise); Ex. 115 (equipment purchase agreement of April, 2007, between Snap-On Credit and Carlson individually). The corporation ultimately paid the monthly bills on those contracts and leases. Carlson testified that DL Carlson Enterprises, Inc. either paid the debts associated with those personal agreements directly from the business accounts, or it paid Debtors and Debtors then paid those obligations. *See, e.g.*, Ex. 208 (containing a copy of a check from DL Carlson Enterprises, Inc. as a direct payment to the lessor for the business premises leased in Carlson's name); Ex. 117 (showing "customer deposits" to Debtors' personal checking account which Carlson testified came from DL Carlson Enterprises and which he further testified were then used to pay the obligations Debtors incurred in their personal capacity on behalf of the corporation). However, there were no specific agreements or documentation

---

[13] Although Idaho Code § 30-1-701(1) requires annual shareholder meetings, the ABA official comments to that section state: "Many corporations, such as . . . closely held corporations, do not regularly hold annual meetings, and if no shareholder objects, that practice creates no problem under section 701, since 701(3) provides that failure to hold an annual meeting does not affect the validity of any corporate action."

MEMORANDUM OF DECISION - 15

between Debtors and DL Carlson Enterprises, Inc. regarding such liabilities or payments, or whether such payments constituted shareholder draws or repayment of shareholder loans.[14]

Finally, when the corporation ceased to operate the Cottman business, Debtors caused the assets of the corporation to be sold, and they received approximately $20,000 in cash which they deposited into their personal account. Under Idaho Code § 30-1-1405(1), in winding up the business of a corporation, the corporation must discharge its liabilities to corporate creditors prior to making distributions to its shareholders. *See also* I.C. § 30-1-1409 (1) ("Directors shall cause the dissolved corporation to discharge or make reasonable provision for the payment of claims and make distributions of assets to shareholders after payment or provision for claims."); *see also Wilson v. Baker Clothing, Co.*, 137 P. 896, 898-99 (Idaho 1913) (noting that "the property of a corporation cannot be distributed among its stockholders, or applied to any purpose foreign to the legitimate business of the corporation, until its debts are paid"). Carlson testified that by retaining the $20,000, Debtors were merely paying DL Carlson Enterprises, Inc's

---

[14] As another example, DL Carlson Enterprises, Inc., dba Cottman Transmission, obtained an SBA loan. Debtors signed the loan documents solely as officers, thus creating a corporate liability. Debtors were personal guarantors of the corporate debt on that loan. However, Debtors refinanced their home to obtain funds with which to pay off the corporation's SBA loan. Debtors considered that action "a loan" to the corporation. However, no documents regarding a shareholder loan to the corporation were produced.

MEMORANDUM OF DECISION - 16

"largest" creditor, *i.e.* Debtors.[15]  Without adequate evidence validating Debtors'

status as creditors, the distribution may be viewed as an impermissible distribution

to shareholders prior to the corporation satisfying its liabilities to creditors, or as

the final example of Debtors' intermingling of assets between the corporation and

its owners.

   The Court recognizes that certain corporate formalities which acknowledge

the separate legal status of DL Carlson Enterprises, Inc were followed.[16]  However,

after considering the evidence presented, the Court concludes that Plaintiff has

demonstrated that corporate formalities were not appropriately observed.  The

preponderating evidence shows that Debtors did not always treat DL Carlson

Enterprises, Inc. as a separate legal entity, and recognizing it as an independent

corporate entity for liability purposes now would generate an inequitable result.

Therefore, the Court concludes the corporate veil will be pierced and Debtors will

be liable for Cottman's debts.

   The next question is whether Cottman committed fraud.  That requires,

initially, consideration of the acts of Davis on behalf of Cottman.

---

[15]  This adjective is apparently meant to sweep in both shareholder loans and Debtors'
personal satisfaction of the SBA debt.

[16]  Such formalities include registering with the Idaho Secretary of State and filing the
corporation's certificate of assumed business name as Cottman Transmission in March, 2005.  *See*
Ex. 208.  Debtors also kept separate personal and corporate bank accounts.  Carlson further
testified that he had an accountant prepare separate personal and business tax returns, although
such documents were not provided to the Court.

MEMORANDUM OF DECISION - 17

**B.    Agency**

As noted, Plaintiff argues that Davis' promise, while acting as a manager for Cottman, to install an ATS triple disk converter as a replacement for Plaintiff's damaged Sun Coast converter, was a fraudulent representation.  This Court held in *Wheels Unlimited, Inc. v. Sharp (In re Sharp)*, 2009 WL 511640, *4 (Bankr. D. Idaho Jan. 14, 2009), that "[a]ctual fraud by a debtor's agent may be imputed to the debtor for nondischargeability purposes even where the debtor has no knowledge of that fraud."

Debtors concede Davis was Cottman's agent.  *See* Doc. No. 22 at 7 ("Clearly [Davis] was an agent of Cottman, he was an employee, as he was the shop manager.").  An agent may bind its principal when the agent acts with actual or apparent authority.  Actual authority may be express or implied.  Idaho Courts have noted that "Express authority occurs when a principal explicitly authorizes an agent to act on the principal's behalf.  Implied authority derives from those actions necessary to accomplish an act expressly authorized.  Apparent authority occurs when a principal by words or actions voluntarily places an agent in such a position that an ordinary person of business prudence would believe the agent is acting pursuant to existing authority." *Huyett v. Idaho State Univ.*, 104 P.3d 946, 950 (Idaho 2004); *see also Sharp*, 2009 WL 511640 at *5.

Here, Carlson testified that he set up Cottman to be run by a "center manager" and that he hired Davis to fill that position.  Davis, as center manager,

MEMORANDUM OF DECISION - 18

had the express authority to transact Cottman's shop business and, according to Carlson, that included "to a point" the ability to resolve customer disputes.[17] While Carlson did not testify that Davis had the express authority to agree to install an ATS converter to satisfy the concerns of a customer, the Court concludes such a transaction would fall within Davis' implied actual authority to resolve customer disputes.

Moreover, Carlson placed Davis in the position of center manager to deal with the customers of the business and oversee the services Cottman provided to those customers. By those actions, an ordinary person would believe that Davis had the ability to remedy a dispute arising out of such services including a promise to replace a damaged converter. This establishes apparent authority. On this record, the Court concludes Davis was Cottman's agent and he had the implied, actual authority and the apparent authority to bind Cottman (and, because the corporate veil has been pierced, to bind Debtors) with his promise to install an ATS converter. Therefore the Court must determine if any damages from such a promise fall under the false pretenses, false representation, or actual fraud provisions of § 523(a)(2)(A).

### C.   Section 523(a)(2)(A)

Pursuant to § 523(a)(2)(A), Plaintiff must show that he is owed a debt "for

---

[17] Davis similarly testified that he "had all the duties and aspects of running the store in [Carlson's] absence" and that his duties included resolving customer complaints. Ex. 207 at 7, 31.

MEMORANDUM OF DECISION - 19

money, property, services, or an extension, renewal, or refinancing of credit, to the

extent obtained, by – false pretenses, a false representation, or actual fraud . . . ."

*See* § 523(a)(2)(A).  A cause of action under § 523(a)(2)(A) requires proof of

several elements.  Plaintiff must prove by a preponderance of the evidence (1)

misrepresentation, fraudulent omission, or deceptive conduct by the debtor in

obtaining money, property, services or credit; (2) debtor's knowledge of the falsity

or deceptiveness of his statement or conduct; (3) an intent to deceive; (4)

justifiable reliance by the creditor on the debtor's statement or conduct; and (5)

damage to the creditor proximately caused by such statement or conduct.  *Turtle*

*Rock Meadows Homeowners Ass'n v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085

(9th Cir. 2000); *Am. Express Travel Related Servs. Co. v. Hashemi (In re*

*Hashemi)*, 104 F.3d 1122, 1125 (9th Cir. 1996); *Oney v. Weinberg (In re*

*Weinberg)*, 410 B.R. 19, 35 (9th Cir. BAP 2009).

Section 523(a)(2)(A) "should not be read more broadly than necessary to

effectuate policy, e.g., preventing debtors from avoiding debts incurred by fraud or

other culpable conduct" and, thus, should be "construed strictly against creditors

and in favor of debtors."  *Ghomeshi v. Sabban (In re Sabban)*, 384 B.R. 1, 5-6 (9th

Cir. BAP 2008) (citations omitted).

### 1.    Representation

As noted, in closing arguments Plaintiff focused his fraud claim on solely

Davis' promise that Cottman would install an ATS converter as a replacement for

MEMORANDUM OF DECISION - 20

Plaintiff's damaged Sun Coast converter.[18]  Though Davis claims he did not make
such a promise, the Court observed Plaintiff testify to the contrary and finds
Plaintiff to be a credible witness.[19]  Plaintiff researched the types of converters
available for his Vehicle considering its intended use.  He had already burned
through one single disc converter and determined that a triple disc was required.
He was knowledgeable regarding the products.  The Court concludes that Plaintiff
would not have simply acquiesced to whatever converter Davis thought should be
installed, as Davis testified.  Moreover, Mr. Rainey, who was present during the
conversation regarding the replacement of the converter, corroborated Plaintiff's
testimony.

The Court finds Davis did promise to replace Plaintiff's Sun Coast
converter with an ATS converter.  Thus, Davis' representation that an ATS
converter would be installed in Plaintiff's Vehicle, if made with the requisite

---

[18]  There is a subset of § 523(a)(2)(A) authority that validates nondischargeability actions
for "promissory fraud."  These cases require proof that at the time the promise was made, it was
then known to the maker to be false and that there was no intent or ability to perform the promise.
*See*, *e.g.*, *Tobin v. Sans Souci Ltd. P'ship (In re Tobin)*, 258 B.R. 199, 203 (9th Cir. BAP 2001)
(addressing California law); *McCrary v. Barrack (In re Barrack)*, 217 B.R. 598, 606 (9th Cir.
BAP 1998) (promise made with positive intent not to perform or without a present intent to
perform satisfies § 523(a)(2)(A), citing *Rubin v. West (In re Rubin)*, 875 F.2d 755, 759 (9th Cir.
1989)); *Sharp*, 2009 WL 511640 at *5 n.23 (representation establishing actual fraud may be a
promise) (citations omitted).  The Court notes that this is a theory specifically applicable to
§ 523(a)(2)(A) fraud claims in bankruptcy, and that Idaho law does not recognize or allow fraud
claims based on promises or representations as to future events.  *See*, *e.g.*, *Thomas v. Med. Ctr.
Physicians, P.A.*, 61 P.3d 557, 564 (Idaho 2002) (citing *Sharp v. Idaho Inv. Corp.*, 504 P.2d 386,
396 (Idaho 1972)).

[19]  The Court is unable to make a comparison of credibility between Davis and Plaintiff
as Debtors chose to present Davis' testimony through deposition only and the Court was thus
unable to observe Davis' demeanor while testifying.

MEMORANDUM OF DECISION - 21

knowledge and intent by Davis, may be imputed to Debtors.

### 2.    Falsity, knowledge and intent

A promise made with a positive intent not to perform or without a present intent to perform satisfies § 523(a)(2)(A).  *Barrack*, 217 B.R. at 606 (quoting *Rubin*, 875 F.2d at 759).[20]  Plaintiff must establish that Davis knew his representation that Cottman would install an ATS converter into Plaintiff's Vehicle was false and that Davis did not intend for Cottman to install the ATS converter.

Direct evidence of knowledge and fraudulent intent is rarely present; instead, Plaintiff may prove knowledge and intent through circumstantial evidence. *See Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1018 (9th Cir. 1997); *Sharp*, 2009 WL 511640 at *6-7.  Here, the evidence establishes that a Precision single disc converter was installed in Plaintiff's vehicle instead of the ATS converter that was promised.  The circumstances surrounding the transaction persuade the Court that Davis knew an ATS converter would not be ordered and he never intended to install an ATS converter in Plaintiff's Vehicle.  The testimony established Davis showed Plaintiff an ATS website on Cottman's computer, and represented that he was in touch with ATS by telephone and requesting the "biggest [and] baddest" ATS converter available for Plaintiff's Vehicle.  Yet, no ATS converter was ordered by Cottman.  Instead, Davis ordered a Precision heavy

---

[20]   A representation which the debtor knew or should have known was outside of the debtor's prospective ability to perform also satisfies § 523(a)(2)(A).  *Id.* (citing *McMillan v. Firestone (In re Firestone)*, 26 B.R. 706, 715 (Bankr. S.D. Fla. 1982)).

MEMORANDUM OF DECISION - 22

duty single disc converter, and installed it in the Vehicle.  Ex. 106.

This does not appear to the Court like a case where Davis originally intended to provide an ATS and only later found he could not supply that converter to Plaintiff.  The facts and circumstances surrounding the transaction and the subsequent litigation do not support such a conclusion.  Such facts show this was not an innocent misrepresentation but, rather, that Davis made the promise knowing it was false and intending to deceive Plaintiff.

Davis did not tell Plaintiff that a Precision converter was installed.  Indeed, he went so far as to fill in a repair order – after the installation of the Precision converter – which stated Plaintiff's vehicle had an "ats billet triplelock."  Ex. 104. The Court concludes this document was not produced merely because Plaintiff was an irate customer, as Davis contends, but rather as part of Davis' attempt to continue the misrepresentation he perpetrated upon Plaintiff at the time he promised installation of an ATS converter.

### 3.    Reliance

Finding that Davis' representation was knowingly false and was made with an intent to deceive Plaintiff, the Court must next determine if Plaintiff justifiably relied upon such a statement.  *See Field v. Mans,* 516 U.S. 59, 74-75 (1995) (determining § 523(a)(2)(A) requires justifiable reliance as opposed to reasonable reliance).  Justifiable reliance looks to the "qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the

MEMORANDUM OF DECISION - 23

application of a community standard of conduct to all cases." *Id.* at 71 (quoting

Restatement (Second) of Torts § 545A cmt. b (1976)).

Here, Cottman was in the business of selling, installing and overhauling

transmissions.  Davis and Plaintiff had prior dealings regarding Plaintiff's

converter and the problems associated with the same.  The relationship between

the parties was strained by the time Davis promised the ATS converter.  For

example, Plaintiff testified that upon his return from Michigan, he required

Cottman to call him when the Sun Coast converter was removed from the Vehicle

so that he could personally see the extent of the damage.  Cottman failed to call,

and it was only after he initiated a call to Cottman that Plaintiff learned that the

Sun Coast converter had been removed.  Plaintiff then returned to Cottman to

inspect the Sun Coast converter himself.

It is clear from Plaintiff's actions and testimony that he did not trust Davis

to properly report any problems with his Sun Coast converter.  The question

becomes whether that mistrust precluded his actual and "justified" reliance on

Davis' promise to replace the Sun Coast converter with an ATS converter.  As

noted in *Field*, "[i]t is only where, under the circumstances, the facts should be

apparent to one of his knowledge and intelligence from a cursory glance, or he has

discovered something which should serve as a warning that he is being deceived,

that he is required to make an investigation of his own" *Id.* at 71-72 (quoting W.

Prosser, Law of Torts § 108, p. 718 (4th ed.1971)).  Plaintiff's reliance is not

MEMORANDUM OF DECISION - 24

justified if "he knows that it is false or its falsity is obvious to him."  Restatement

(Second) of Torts § 541 (1976); *see also* Restatement at § 544 (stating that a

"recipient of a fraudulent misrepresentation of intention is justified in relying upon

it if the existence of the intention is material and the recipient has reason to believe

that it will be carried out.").

Here, the circumstances surrounding the promise provided some assurance

of its accuracy.  Davis showed Plaintiff the ATS website during their discussion

and initiated telephone contact with ATS, while Plaintiff was present, regarding

the triple disc ATS converter.  However, the evidence also demonstrates Plaintiff

had questioned and continued to question Davis' veracity.  While allowing

installation of a new converter, immediately upon retrieving his Vehicle Plaintiff

crawled under it to check the converter.  He testified that he was excited to see the

ATS Viking purple converter in his Vehicle and "for whatever reason" looked at

the converter as soon as he returned home.  The Court concludes Plaintiff was

motivated by more than excitement; he was motivated by suspicion that Davis

would not carry out his promise to install an ATS converter.  Plaintiff had, in other

words, "discovered something which should serve as a warning that he is being

deceived" through his prior dealings with Davis, and Plaintiff lacked confidence in

the truth of Davis' representation.  Given the fact that the Court finds Plaintiff's

suspicions existed, and reasonably so based on the parties' dealings, the Court

cannot conclude Plaintiff in fact justifiably relied on Davis' representation.

MEMORANDUM OF DECISION - 25

Though the lack of justifiable reliance precludes entry of judgment on the § 523(a)(2)(A) cause of action,[21] the Court, for completeness, addresses the final required element of that cause.

### 4. Damages

#### a. Proximate cause

Even assuming Plaintiff's reliance was justified, Plaintiff must prove he was damaged as a proximate cause of the fraudulent representation. The Supreme Court stated that the debt that is nondischargeable under § 523(a)(2)(A) must be traceable to the fraud. *Field*, 516 U.S. at 440 (relying on the Restatement (Second) of Torts). In *Cohen v. de la Cruz*, 523 U.S. 213 (1998), the Supreme Court further interpreted § 523(a)(2)(A)'s language, which makes nondischargeable "any debt . . . for money, property, services, or . . . credit, to the extent obtained by . . . false pretenses, false representation, or actual fraud[.]" It stated:

> "[T]o the extent obtained by" modifies "money, property, services, or . . . credit" – not "any debt" – so that the exception encompasses "any debt . . . for money, property, services, or . . . credit, *to the extent [that the money, property, services, or . . . credit is] obtained by" fraud. . . . Once it is established that specific money or property has been obtained by fraud,* however, "any debt" arising therefrom is excepted from discharge.

*Id.* at 218 (emphasis added). Based on the language of § 523(a)(2)(A) and the

---

[21]   *See, e.g.*, *Slyman*, 234 F.3d at 1085 (noting that the creditor must demonstrate each of the five elements by a preponderance of the evidence); *see also*, *Esposito v. Noyes (In re Lake Country Invs., LLC)*, 255 B.R. 588, 597, 00.4 I.B.C.R. 175, 178 (Bankr. D. Idaho 2000) (noting, in a summary judgment context, that a moving party's failure to sustain its burden on any one element of a cause of action is fatal to that cause).

Supreme Court's ruling in *Cohen*, a plaintiff must show the "specific money or property" a debtor obtained by fraud. It follows that, "[i]f the property or services were obtained before the making of any false representation, subsequent misrepresentations will have no effect on dischargeability." 4 Collier on Bankruptcy ¶ 523.08[1][d] at 523-45 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2009); *see also Telmark, LLC v. Booher (In re Booher)*, 284 B.R. 191, 201 (Bankr. W.D. Penn 2002) (requiring an actionable misrepresentation prior to debtor's acquisition of value from the creditor); *Burbank v. Capelli (In re Capelli)*, 261 B.R. 81, 88 (Bankr. D. Conn. 2001) (noting that a subsequent false representation could not have been a creditor's reason for extending credit and was therefore not actionable under § 523(a)(2)(A)).

Here, Plaintiff paid Cottman for what was ultimately a poor, if not improper, installation of his Sun Coast converter.[22] Such expenditures were made *prior* to the proven fraudulent representation.[23] Plaintiff did not pay Cottman money in reliance upon Davis' fraudulent statement regarding the ATS converter. It was only after Cottman improperly installed the stock bolts in the converter (and after Plaintiff paid for that installation), and after the Sun Coast converter was damaged that Davis promised to install an ATS converter. Therefore, the damages

---

[22] Given Ex. 102 and Plaintiff's testimony, it appears he paid $1,105.00 for the original installation of the Sun Coast converter.

[23] Plaintiff does not cite to, nor does he claim to rely on, any other knowingly false representation prior to the original installation.

MEMORANDUM OF DECISION - 27

for and flowing from the payment for the improper initial installation would not be
exempt from discharge under § 523(a)(2)(A).[24]

While Plaintiff did not pay "money" for the promised ATS converter,
Plaintiff did provide "property" for the promised converter by relinquishing his
damaged Sun Coast converter to Cottman in exchange for the installation of the
ATS converter.  In addition, Plaintiff refrained from initiating suit on any
negligence or breach of warranty claims he had.  Plaintiff has not, however,
adequately proven damage flowing from this exchange.

### b.    Calculation of damages

A plaintiff must prove the specific amount of the damage caused by the
fraudulent representation.  In *Field*, the Supreme Court relied upon the
Restatement (Second) of Torts (1977) as "the most accepted distillation of the
common law of torts" in analyzing § 523(a)(2)(A)'s reliance component.  516 U.S.
at 70.  It is equally appropriate to look to the Restatement when analyzing
damages.  *Barney v. Perkins (In re Perkins)*, 298 B.R. 778, 791 (Bankr. D. Utah
2003), notes the proper measure of damages under § 523(a)(2)(A) is found in

---

[24]  Plaintiff also seeks compensation for the money paid to repair the Vehicle while in
Michigan and the amounts necessary to repair the Sun Coast converter two years after the
representation was made.  However, the amount to (1) repair the Vehicle while in Michigan and
(2) repair the damage to Plaintiff's Sun Coast converter, were not proximately caused by the
fraudulent representation to install an ATS converter.  Instead, the Michigan repair cost is a
damage that goes to a possible breach of warranty or negligence cause of action and which arose
as a result of acts done well prior to the fraudulent representation.  The damage and cost of repair
of the Sun Coast converter also goes to a possible breach of warranty or negligence cause of
action.  The fact that he incurred the expense after the fraudulent representation was made does
not automatically make it a damage flowing from the representation.

MEMORANDUM OF DECISION - 28

§ 549 of the Restatement.  That section states:

> (1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including
>
> > (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
> >
> > (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.
>
> (2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

### i.  Difference of value damages (Restatement § 549(1)(a))

Plaintiff could receive damages based on the difference between (a) the value of what he received (the Precision converter) and (b) the purchase price paid or other value given for it.  Plaintiff paid no money, purchase price or otherwise, for the Precision converter.  But he has shown he gave up his damaged Sun Coast converter upon the promised installation of an ATS converter.  Plaintiff did not prove, however, that the Precision was less valuable than the damaged Sun Coast converter.  While the evidence establishes Cottman paid $256.75 for the Precision converter, there was no evidence regarding the value of the damaged Sun Coast converter that was relinquished by Plaintiff.  Ex. 106.  Moreover, Cottman returned Plaintiff's damaged Sun Coast converter shortly after it was removed from

MEMORANDUM OF DECISION - 29

the Vehicle and there was no evidence regarding any depreciation in value from

the time it was relinquished to when it was returned.  Therefore, on this evidence,

Plaintiff received the Precision converter in exchange, initially, for the damaged

Sun Coast converter, but ultimately gave up no property or money in the

transaction.

The only other possible item of value provided by Plaintiff was his delay in

initiating his lawsuit in state court for approximately three months.  Assuming

without deciding that such restraint provides value or qualifies as the exchange of

property or the extension of credit within the ambit of § 523(a)(2)(A), Plaintiff did

not quantify that value.  Plaintiff was not barred due to the delay from bringing any

of his alleged causes of action.  Indeed, he filed his lawsuit on January 29, 2008,

mere months after the fraudulent representation.  Therefore, the Court cannot

conclude that Plaintiff adequately proved a value given in exchange for the

Precision converter.

### ii.    Consequential damages
### (Restatement § 549(1)(b))

Consequential damages may also be recovered in actions for fraud.  The

Restatement notes that "the loss may result from a purchaser's use of the article for

a purpose for which it would be appropriate if the representation were true but for

which it is in fact harmfully inappropriate."  Restatement (Second) of Torts, § 549

cmt. d.  Plaintiff has not proven any such consequential damages.  There was no

MEMORANDUM OF DECISION - 30

proof of actual harm or damage to the Vehicle due to the installation of the
Precision converter.  While Plaintiff testified that when he realized he did not have
an ATS converter he altered his use of the Vehicle, he did not testify to or
otherwise establish any specific reduced value due to such change of use.  Nor did
he adequately explain, if use was diminished, why he continued to use the Vehicle
for approximately two years and for over 33,000 miles before repairing and
reinstalling his Sun Coast converter.  There was no specific amount of
consequential damage proven.

### iii.   Benefit of the bargain damages (Restatement § 549(2))

Finally, the Restatement recognizes certain instances when actual damages
will not adequately compensate a plaintiff and thus recognizes a benefit of the
bargain damage.  *See* Restatement (Second) of Torts, § 549 cmt. g (justifying the
allowance of benefit of the bargain damages and noting that "[i]f the value of what
the plaintiff has received from the defendant is fully equal to the price he has paid
for it or other value he has parted with and he has suffered no consequential
damages, he may be unable to recover at all under the rules stated in Subsection
(1)").  However, such damages may not be awarded based on speculation.  *Id.* cmt
h (noting that damages are allowed based on "either the out-of-pocket or the
benefit-of-the-bargain rule in any case in which the latter measure can be
established by proof in accordance with the usual rules of certainty in damages").

MEMORANDUM OF DECISION - 31

Here, Plaintiff credibly testified that he would not have agreed to the exchange of converters for anything other than an ATS converter. Although Plaintiff did not prove actual damages, *see supra*, he might have been able to claim benefit of the bargain damages because he was placed in a position of having a converter in his Vehicle that he did not want. Unfortunately, Plaintiff did not establish the benefit of the bargain amount. He did not prove the value of the promised ATS converter as opposed to the Precision converter he received.

On this record, the Court concludes Plaintiff failed to establish the necessary causal link to any specific monies or property expended, *see Cohen*, 523 U.S. at 218, and failed to prove compensable damages with adequate specificity.

To be sure, this case was never really advanced in order to recover the damage that *Cohen* and the Restatement address. Instead, Plaintiff attempted to use the fraudulent representation as a springboard to assert Cottman's (and, upon piercing the corporate veil, Debtors') statutory liability under the ICPA. That liability includes attorneys' fees.[20] Had Plaintiff established all the § 523(a)(2)(A) elements by a preponderance, including reliance and proximate damage, *Cohen*, would support a claim for "any debt" arising from the fraud. 523 U.S. at 218. This could include statutory damages under the ICPA arising from the same conduct. *See Wiggins v. Peachtree Settlement Funding (In re Wiggins)*, 02.1

---

[20]   When asked at oral argument to specify his claimed damages, Plaintiff focused primarily on such attorney fees, and only to a lesser extent on the initial (pre-representation) installation cost and the later (2-year post-representation) reinstallation cost.

MEMORANDUM OF DECISION - 32

I.B.C.R. 8, 9 (Bankr. D. Idaho 2002) (holding that upon a finding of violation of the ICPA that also meets the elements of § 523(a)(2), "entitlement to an award of attorney fees and costs is substantive in nature, and is applicable in an action prosecuted in the Bankruptcy Court for claims based upon the Idaho Consumer Protection Act"); *Idaho v. Edwards (In re Edwards)*, 233 B.R. 461, 477-79, 99.2 I.B.C.R. 41, 47-49 (Bankr. D. Idaho 1999). However, given that Plaintiff did not meet his burden under § 523(a)(2)(A), the Court need not analyze the ICPA allegations.

**CONCLUSION**

Plaintiff failed to meet his burden to establish by a preponderance of the evidence two of the five elements under § 523(a)(2)(A). Consequently, the complaint herein shall be dismissed. Counsel for Debtors may prepare an appropriate form of order and judgment.

DATED:  March 19, 2010



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 33